Maurice **WILLIAMS,**
**Appellant (Plaintiff),**

v.

**COLLINS COMMUNICATIONS, INC., a**
**Wyoming corporation, Appellee**
**(Defendant).**

No. 85–265.

Supreme Court of Wyoming.

June 10, 1986.

Rehearing Denied June 29, 1986.

S. Thomas Throne and Thomas E. Campbell, Sheridan, for appellant.

David F. Palmerlee of Omohundro and Palmerlee, Buffalo, for appellee.

Before THOMAS, C.J., BROWN, CARDINE and URBIGKIT, JJ., and GUTHRIE, J., Retired.

URBIGKIT, Justice.

The parties assiduously pleaded and comprehensively litigated a contractual relationship involving radio tower facilities. Appellee, Collins Communications, Inc. (Collins), original defendant and counterclaimant, enjoyed trial success by entry of a favorable specific-performance decree against appellant Maurice Williams, from which decision this appeal was taken. The parties have spared no effort in reaching this stage in a demonstration of contractual disaffinity.

We will generally affirm, except to remand for an accounting under the contract for revenues received by each party between January, 1983, and the date of effectuation of the specific-performance decree.

Some time prior to 1976, by oral agreement, and then by written agreement dated July 1, 1976, Collins and Williams came to be jointly involved in the operation of radio communication towers on Warren Peak in northeast Wyoming. The Peak, topographically dominant in the area, involved a parcel of land originally acquired from Williams by condemnation for a government radar installation, later transferred to the United States Forest Service upon discontinued installation use, with the surround-

ing land remaining in the ownership of Williams. In 1975, Collins had obtained a special use permit for the construction of a radio tower on the Forest Service parcel.

By trial date, there were four towers on the Peak. The first, predating the written agreement, was the Forest Service tower; a second, designated the Materi tower, was located on the Williams property, and was expressly excluded from the agreement; the third, designated the middle tower, was located on Williams' property, apparently constructed by the parties before the 1976 written agreement, or at least operated jointly before that date. Construction of the fourth, the Williams tower, was completed by Williams in October, 1983.

The 1976 agreement effectuated a joint use of the properties for radio-tower utilization, retroactive to September 1, 1975 and expiring December 31, 1992, and provided for equal division of revenue and expenses, and

"COLLINS will operate all of the communications sites on Exhibits 'A' [Forest Service parcel] and 'B' [surrounding Williams' land], collect and administer all income received therefrom, make all arrangements and contacts for new customers to be placed on said communications sites, and COLLINS will have complete control over the development and expansion of said sites and will use their best efforts to fully develop said sites in the proper manner so as not to create excessive communications interference."

"COLLINS will account monthly to WILLIAMS with regard to all rental income received, costs and other expenses expended and will forward to WILLIAMS his proportionate share of said rental income as provided for herein. COLLINS will also furnish to WILLIAMS the identical data sheets as supplied to the U.S. Forest Service and will furnish WILLIAMS, upon request, with copies of invoices for all site rentals. In the event WILLIAMS shall receive any income from said communications sites, he will also make such accounting to COLLINS.

" 'It is understood and agreed that at such time as the communications equipment constructed or hereafter to be constructed upon said property has been paid for from the rental derived therefrom, that both COLLINS and WILLIAMS shall equally own said equipment as tenants in common.' "

" 'Except as to the service to Materi Exploration Company and Belle Fourche Pipe Line company, heretofore mentioned, neither COLLINS nor WILLIAMS shall construct, operate or maintain any communications system in competition to the communications system contemplated herein within 10 miles of the real property described in Exhibit "A" and Exhibit "B" attached hereto.' "

There was something less than total payment regularity for amounts due to Williams on the contract, although with the joint control of the market by a monopoly of locations on the Peak, the venture was mutually profitable.

In 1981, Motorola Communications and Electronics Inc. (Motorola), a competitor of Collins in radio communications systems, inquired of Collins about placing a community repeater on the facility. Communication ensued, but no real negotiations occurred.

In the Fall of 1982, Williams commenced construction of the Williams tower, and it was completed in the Fall of 1983, when he put Motorola and an associate, Crescent Communications, on the tower, acquired a few customers from Collins, and added some new business. The tower cost and expenses were $12,320, and revenues totaled $18,200. In January, 1983, Collins stopped paying Williams the pro-rata share under the contract, with a net revenue from that date to date of decree of $58,982, or $29,491, as the Williams distributable share.

In November, 1984, the litigative campaign was started by Williams, claiming for an accounting, payments with interest, and partnership dissolution and distribution. As its pleadings, with numerous defenses, Collins pleaded Williams' breach of con-

tract by construction of the Williams tower, with a counterclaim for damages, requesting specific performance, and alleging a cause of action in libel.

Extended pretrial proceedings, including motions for summary judgment, led the case at trial commencement to accommodate two issues: claim of Williams for breach of contract by Collins, and counterclaim of Collins for breach by Williams.

At the commencement of the trial, pursuant to a motion in limine, but generally as a ruling on the case, the court determined that the contract was clear and unambiguous, and ruled that interpretative evidence for the written contract would not be admitted at trial.

A jury was empaneled, and at the close of Williams' evidence a directed verdict was granted against him and in favor of Collins, on the original complaint. Collins elected to proceed in specific performance rather than damages, and the parties then stipulated that the counterclaim would be tried by the court on that issue. Following trial, the court ruled for the defendant in granting specific performance on the written contract, but awarded no damages or accounting to either party for payments then accrued and unpaid under the contractual provisions.

The issues have been variously stated, not only in appellant's brief, but in prior presentations to the trial court, but are best detailed in sequential relationship to the proceedings as claimed error by:

(A) denying summary judgment for Williams on his complaint;

(B) determination that the contract was not ambiguous and consequently rejecting interpretative evidence from Williams;

(C) admission of objectionable hearsay evidence;

(D) entry of directed verdict against Williams on his complaint; and

(E) limitation of the scope of the final judgment as denying an accounting for the contractual proceeds.

## A

### Denial of Williams' Motion for Summary Judgment

The trial court accurately found evidentiary conflicts in its initial denial of summary judgment. More than a reasonable doubt existed as to the nonexistence of a factual issue otherwise required for summary judgment. *Cordova v. Gosar*, Wyo., 719 P.2d 625 (1986); *Durdahl v. Bank of Casper*, Wyo., 712 P.2d 23 (1986).

■ Additionally, the subsequent entry of a directed verdict against Williams, after his case in chief was concluded, is rationally dispositive of any question as to his earlier right to favorable summary judgment. Failure to withstand a directed verdict is logically persuasive of the existence of an unfavorable status for earlier summary judgment. *Kuehne v. Samedan Oil Corp.*, Wyo., 626 P.2d 1035 (1981).

## B

### Determination That the Contract Was Not Ambiguous

■ This court has regularly and forcefully ruled that the determination whether a written agreement is ambiguous is a determination of law, to be made by the trial court. *E & E Mining, Inc. v. Flying Group, Inc.*, 718 P.2d 58 (1986); *Sannerud v. First National Bank of Sheridan*, Wyo., 708 P.2d 1236, 1240 (1985) (construction of an unambiguous agreement is done by the court as a matter of law); *Shepard v. Top Hat Land & Cattle Co.*, Wyo., 560 P.2d 730 (1977); *Goodwin v. Upper Crust of Wyoming, Inc.*, Wyo., 624 P.2d 1192 (1981); *Madison v. Marlatt*, Wyo., 619 P.2d 708 (1980).

"If the language of a contract is plain and unequivocal, that language is controlling and the interpretation of its provisions is for the court to make as a matter of law. The meaning of the instrument is to be deduced only from its language if the terms are plain and unambiguous." *Hollabaugh v. Kolbet*, Wyo., 604 P.2d 1359, 1361 (1980).

Nothing in the discovery evidence presented before trial or the facts introduced at trial afford a basis for concluding that the trial court's decision was incorrect. We agree that the agreement was clear and understandable as to the undertaking by the parties as defined in the written instrument.

## C

### Inadmissible Hearsay Evidence

In the course of Williams' case in chief, a representative of Collins was called as an adverse witness. The examination was extended, and on cross-examination by his own counsel the earlier subject of Motorola negotiations was addressed. At issue was the question of whether the response by Collins to Motorola for radio-tower rental services was of a nature to terminate further discussions, as contended by Williams, or whether it was a high opening bid to allow room for negotiations, as contended by Collins. In answer to the direct-examination inquiry as to the intent of Collins, tender was made, in cross-examination, of a letter written by a representative of the United States Forest Service to Motorola, found in the files of the Forest Service office in Sundance, Wyoming.[1]

The evidentiary status addressed at trial was that the author of the letter, earlier listed as a witness, had been transferred to Idaho, and the representative at the Sundance office subpoenaed to testify as to foundation from the records was unavailable due to an automobile accident in traveling to the trial.

Introduction of the exhibit was strenuously contested by Williams, since the exhibit was obviously intended by Collins to show fair dealings under the contract, but accepted by the trial court in its decision both on directed verdict and entry of the specific-performance decree:

"5. That with regard to the duty to develop, the evidence adduced was that there was space available on one of the two existing towers for further development, and that the only evidence of dealing with Motorola came from either Mr. Klinker, who said that the Defendant's dealings were reasonable, and the letter from the Forest Service (Exhibit G), which also indicated they were reasonable."

Except that the exhibit (Exhibit G) was a letter written by a Forest Service employee, addressed to a third party, absolutely no basis for knowledge of the author on the subject of reasonable rates of tower rental was established by the letter or at trial, and, likewise, the trier of fact could not determine what relationship might have existed between the author and Collins, Williams or Motorola. These inquiries would have been normal areas to be explored in cross-examination had the author testified in person. Additionally, this court is not unaware of the general availability of government employees to testify as witnesses if appropriate expenses are afforded, and, conversely, that depositions can normally be scheduled conveniently without all of the formalities that might be required when an unwilling individual is the subject matter of an anticipated deposition. Litigants should not ignore the economics and efficiency accommodated by discovery rules, including specifically Rule 30(b)(7), W.R.C.P., Cum.Supp.1985:

"The parties may stipulate in writing or the court may upon motion order that a

---

1. "Reference your letter concerning renting space at the Warren Peak site for the installation of a community repeater.

"Collins Communications, Inc. was issued a 20 year Special Use Permit in 1972 after the Forest Service solicited bids from parties interested in developing and operating an electronic site on Warren Peak. As permit holder, they make space available on a lease or rental basis to other individuals, companies or corporations for the operation of electronic equipment.

"*The monthly rental fee quoted to you by Collins does appear to be in line with the rates charged to the other users on this site.*

"Please continue to work with Collins and address any questions or problems of a technical nature directly to them.

"If I can be of any further assistance, please feel free to contact our office." (Emphasis added.)

deposition be taken by telephone. For the purposes of this rule and Rules 28(a), 37(a)(1), 37(b)(1) and 45(d), a deposition taken by telephone is taken in the district and at the place where the deponent is to answer questions propounded to him."

This difficult subject will be first addressed by exploring the contentions of the parties provided by appellate brief, and then tracing the file history of the document, reflected by review of the record, in considering the extended and explicit objection to the introduction for lack of foundation and as inadmissible hearsay.

In regard to foundation, argument was made by Williams in his brief that, without authentication or explanation, relevancy was not shown. Under the exigencies of the trial, where a witness from the Forest Service had been subpoenaed and then deterred from appearance by an automobile accident, it is appropriate to recognize the effort of the court in the interest of justice to be reasonable in consonance of the circumstances in ruling on the issue of foundation. Actually, no question existed about the document being a copy of a Forest Service letter taken from their files. The subject matter could be deduced from the text of the document. Relevancy afforded the obvious reason for the introduction objection by Williams, although validity and reliability of the opinion stated in the letter remained in question.

Hearsay, the second aspect for claimed inadmissibility, requires substantially more attention.

Neither party contended or discussed admissibility under either Rule 803(6), W.R.E., business records, or Rule 803(8), W.R.E., public records and reports, and this court will not now attempt that construction in the absence of litigative contention and briefing. See *Village of Evanston v. Gunn*, 99 U.S. (9 Otto) 660, 25 L.Ed. 306 (1878); *Chicago and N.W. Ry. Co. v. Riverton, Fremont County*, 70 Wyo. 119, 247 P.2d 660 (1952); and Paine, *Admissibility of Factual Findings in an Official Investigative Report Under Federal Rule of Evidence 803(8)(c)*, LIII Insurance Counsel Journal 244 (1986).

When Collins contended for admission under Rule 804, Williams objected for the following reasons:

1. Under Rule 804(a)(5), W.R.E., there was an inadequate demonstration of unavailability.

2. The letter did not comply with Rule 804(b)(5), W.R.E., since it is an opinion and not a narration, description or explanation of "an event or condition recently perceived."

3. The letter is not within the admission exception of Rule 804(b)(6) (Rule 804(b)(5) in the federal rules), for three further reasons: (a) equivalent circumstantial guarantees of trustworthiness are lacking; (b) the document is not more probative than evidence available through diligent effort; (c) it does not advance the general purposes of the rules of justice because it results in the admission of unreliable testimony without the corrective benefit of cross-examination available by deposition of the writer.

Except by general objection not otherwise specified, Williams did not raise introduction noncompliance under the notice provisions of the last sentence of Rule 804(b)(6), W.R.E.

Briefing authority was cited in support of the probative/diligence requirement, *Demars v. Equitable Life Assurance Society of United States*, 610 F.2d 55 (1st Cir. 1979), and on the subject of nonavailability requirements of Rule 804(a)(5), as well as in discussion of general hearsay principles as rules of evidence.

The response by Collins, without any case citation or review of the rules, quoted the trial court for support of the Rule 804(b)(5) and (6) hearsay introduction exception ruling and:

" * * * [I]f the district court were wrong and Exhibit G should not have been admitted, admission of Exhibit G was not prejudicial. Assuming arguendo that the rental price was unreasonable, and that the court erred in admitting and relying on Exhibit G, the fact that the price was

unreasonable does not constitute a material breach of the Agreement, either alone, or together with other facts in the record."

Collins further argued by brief that it had no obligation to deal with Motorola, that the high price was to open negotiations, that Motorola would not have rented tower space from Collins, and even if Motorola was excluded as a customer, the minimal loss of revenue was not material as a contract breach. No case citation or further evidence admission justification was afforded by appellee as a response to the general hearsay admission objection discussed by appellant.[2]

Comprehensive record review is required to determine how Exhibit G was introduced under Rule 804. It was not listed as an exhibit by Collins in its pretrial memorandum and exhibit list filed September 19, 1985. In further pretrial submission on September 26, 1985, the author of the exhibit, William E. Lind, was included as a prospective witness. No reference to a proposed Exhibit G is found in any pretrial pleading, and the exhibit was not noticed for pretrial purposes as required by the order for pretrial conference or the Uniform Rules for the District Courts of the State of Wyoming, or otherwise noticed in any other fashion. Noncompliance with

the pretrial process was not raised in objection to introduction, and consequently this court will not contemplate error on that basis. The court is entitled to notice of specific basis for objection or the objection is waived. Rule 46, W.R.C.P.; *Joly v. Safeway Stores, Inc.*, Wyo., 502 P.2d 362 (1972).

This non-notice status does bear specifically, however, on admissibility, under the purview of the last sentence of Rule 804(b)(6):

" * * * However, a statement may not be admitted under this exception unless the proponent of it makes known to the adverse party sufficiently in advance of the trial or hearing to provide the adverse party with a fair opportunity to prepare to meet it, his intention to offer the statement and the particulars of it, including the name and address of the declarant,"

as well as the unavailability determination of Rule 804(a).[3]

Compliance with Rule 804(a) is required before the hearsay exceptions of Rule 804(b) can be applied. We will not determine if the substantive requirements of Rule 804(b)(5) and (6) were met, unless the threshold eligibility of the unavailability request is demonstrated.[4] See the ex-

**2.** This is dangerous briefing, and could result in summary appellate decision from the appearance that appellee did concede improper admission.

**3.** Although the existence of the letter (Exhibit G) was apparently known by Williams, nothing of record reflects its intended introduction before actual presentation. Except as included in the exhibit chart apparently maintained by the trial court, the existence of Exhibit G is nowhere found in the volume of the record constituting the pleadings, and first appeared at trial in the cross-examination inquiry and exchange. The only documented notice that might be found of the intended introduction was occasioned by the issuance of a subpoena on October 4, 1975, to an assistant forest ranger to secure "the entire file regarding the Special Use Permit for the Warren Peak Electronics Site issued to Collins Communications, Inc." Since the trial date followed on October 7, this could hardly be considered as notice of use of the exhibit rather than of the witness who had been listed in pretrial memoranda.

**4.** Admissibility of Exhibit G, under Rules 804(b)(5) and (6) could be resisted (successfully or otherwise) for the following reasons:

(a) noncompliance with pretrial requirements;

(b) not covered by Rule 804(b)(5) in the terms of the rule;

(c) under Rule 804(b)(6): (1) equivalent circumstantial guarantees of trustworthiness are lacking; (2) the document is not more probative than evidence available through diligent effort; and (3) the exhibit does not advance the interest of justice when resulting in the admission of unreliable testimony without the corrective benefit of cross-examination;

(d) no compliance with the mandatory notice requirements of the last sentence;

(e) questionable opinion evidence under Rules 701, 702, 703, and 705, W.R.E.; and

(f) unavailability demonstration of the witness as required by Rule 804(a) is not shown.

haustive analysis of the catch-all hearsay exception in *Schmunk v. State,* Wyo., 714 P.2d 724 (1986).

We limit this decision to the threshold question of the determination of unavailability of the witness since we find that there is insufficient evidence in the record to sustain the admissibility of Exhibit G, and we will not further pursue the other objections which were raised or could have been raised in opposition to introduction. By this disposition we in no way denigrate the importance of other requirements, and especially so as to pretrial notice requirements and the use notice of Rule 804(b)(6). Fairness and justice are both at issue in notice compliance requirements. See *United States v. Iaconetti,* 540 F.2d 574, 36 A.L.R.Fed. 734 (2d Cir.), cert. denied 429 U.S. 1041, 97 S.Ct. 739, 50 L.Ed.2d 752, reh. denied 430 U.S. 911, 97 S.Ct. 1186, 51 L.Ed.2d 589 (1976); Annot., 36 A.L.R.Fed. 742, 747.

The Wyoming Rule 804 definition of unavailability is identical with the federal rule. At issue in this case is the criterion requirement of subsection (a)(5):

"Is absent from the hearing and the proponent of his statement has been unable to procure his attendance by process *or other reasonable means.*" (Emphasis added.)

*The actual principle in contest is whether a witness' nonresidence in Wyoming alone renders letters admissible.* The significance of the question directs this court to resolve inadmissibility on that question.

Factually, little documentary support for admissibility on the Rule 804(a)(5) requirement exists in this case. The contention for compliance was solely based on the transfer of the witness from Wyoming with no effort made to either secure voluntary appearance or to take a deposition.

■ The number of cases is extensive, with perhaps four out of five arising in the criminal context. It must immediately be recognized that admissibility in criminal cases not only encompasses the criteria of Rule 804, but also the confrontation requirements of the Sixth Amendment to the United States Constitution. Consequently, in criminal cases, these criteria may be more strictly construed. See *Schmunk v. State,* supra.

■ Also to be noted is that the type of the hearsay material tendered under the rule exception unquestionably affects the reasonableness considerations when comparing depositions, testimony in prior trials or preliminary hearing evidence, in cases where cross-examination was afforded, to be compared with material such as an ex parte letter as is at issue here.

In this case, we have an opinion letter on a technical question, written to a third party.

The range of standards elicited from the cases goes from due diligence and good faith as alternately and interchangeably used, to mere absence from the subpoena jurisdiction as sufficient. This latter construction essentially excises the "other reasonable means" provision from the evidentiary Rule 804(a)(5).

"* * * Assuming that the declarant cannot be subpoenaed to testify at trial, he still does not satisfy the unavailability criteria of Rule 804(a)(5) if his presence can be obtained by 'other reasonable means.' In civil litigation, it should be necessary for a party invoking one of the exceptions in Rule 804(b) to represent to the court that it communicated with the declarant or tried to do so in an effort to secure his voluntary attendance at trial." 4 Louisell and Mueller, Federal Evidence § 486, pp. 1055–1056 (1980).

See *Janich Bros., Inc. v. American Distilling Co.,* 570 F.2d 848, 859–860 (9th Cir. 1977), cert. denied 439 U.S. 829, 99 S.Ct. 103, 58 L.Ed.2d 122 (1978).

■ Any practical standard or requirement in order to afford fairness or justice mandates accommodation in Rule 804(b)(6) catch-all cases with the concurrent fair-opportunity-to-prepare corollary requirement of the last sentence. If a proponent seeks to rely only on "absence," then respondent

surely must be afforded an opportunity to defend, and particularly so when hearsay opinion statements might be included in the tendered exhibit. This is the significance in this case of the noncompliance with notice requirements of both the pretrial rule and the catch-all exception.

■ It is clear that no absolute rule can be created which will realistically afford justice in all the variegated circumstances occurring in trial activities. Reason and fairness within the sound discretion of the court should be determinative. This is the test of reasonableness.

" * * * [T]he 'reasonable means' clause has the effect of restricting the situations in which the declarant is deemed unavailable by expanding the obligation of the proponent to attempt to secure his live testimony beyond merely exhausting the subpoena power of the court and attempting to depose the witness.

Fairly read, however, the same clause in Rule 804(a)(5) also has the effect of expanding the situations in which the declarant is deemed unavailable by limiting the obligation of the proponent to attempt to secure his live testimony where efforts of this sort are likely to be unproductive or too costly in the light of circumstances.

"That is to say, a fair reading of Rule 804(a)(5) suggests that all three of the factors which it cites as bearing upon the declarant's availability are subject to a reasonableness standard. This reasonableness standard implies that a party offering a statement under Rule 804(b) may satisfy the unavailability criteria of Rule 804(a)(5) [Rule 804(a)(6), W.R.E.] without even attempting to subpoena the declarant if it can be shown that the declarant simply cannot be found, which in turn suggests that the party should be excused from pursuing other means to secure the declarant's attendance and testimony, including efforts to depose the declarant. It implies too that if the party offering a statement under Rule 804(b) can show that his adversary is responsible for the disappearance of the declarant, or for the fact that he has proven difficult to find, less in the way of efforts by the offering party should be considered sufficient to discharge his obligation to try to produce the declarant. "The reasonableness standard also suggests that the stakes in the litigation, the relative resources of the parties, the importance of the declarant's statement in the suit, the foreseeability of need for the statement, and the relative expense and difficulties which would be encountered in securing the declarant's trial or deposition testimony should all be considered in determining whether a party offering a statement under Rule 804(b) made an adequate effort to obtain declarant's trial or deposition testimony." 4 Louisell and Mueller, supra, § 486, pp. 1066–1068.

For application of the test of reasonableness as a standard, specific rules can be ascertained from the extensive authorities and case law.

(1) A discretional factor for the trial court exists. *United States v. Thomas,* 705 F.2d 709 (4th Cir.), cert. denied 464 U.S. 890, 104 S.Ct. 232, 78 L.Ed.2d 225 (1983); *State v. Grable,* Wyo., 649 P.2d 663 (1982); *People v. Masters,* 134 Cal.App.3d 509, 185 Cal.Rptr. 509 (1982); *People ex rel. Faulk v. District Court of Eleventh Judicial District of Colorado,* Colo., 667 P.2d 1384 (1983); *People v. Pullins,* 145 Mich.App. 414, 378 N.W.2d 502 (1985); Comment, *Hearsay Under the Proposed Federal Rules: A Discretional Approach,* 15 Wayne L.Rev. 1079 (1969).

(2) The catch-all exceptions, Rules 803(24) and 804(b)(6), W.R.E., are to be cautiously used and only in exceptional cases, in the interest of justice. *Schmunk v. State,* supra; *Demars v. Equitable Life Assurance Society of United States,* supra; 4 Louisell and Mueller, supra, § 472, pp. 921, 923.

(3) The burden of proving unvailability rests with the proponent of the evidence. *People v. Masters,* supra; *Perricone v. Kansas City Southern Ry. Co.,* 630 F.2d 317 (5th Cir.1983); *Complaint of Bankers*

*Trust Co. v. Chatterjee*, 40 F.R.S.2d 1181, 752 F.2d 874 (3d Cir.1984); *Baylor v. Jefferson County Board of Education*, 733 F.2d 1527 (11th Cir.1984); *Dartez v. Fibreboard Corp.*, 765 F.2d 456 (5th Cir.1985); *People ex rel. Faulk v. District Court*, supra; *Estate of Schoch v. Kail*, 209 Neb. 812, 311 N.W.2d 903 (1981); *Compton v. WWV Enterprises*, Tex.App., 679 S.W.2d 668 (1984); 4 Louisell and Mueller, supra, § 486, p. 1026; V. Wigmore, Evidence § 1414, p. 237.

(4) The availability quotient is intrinsically involved in the particular use intended and the type of material to be introduced as raising the other criteria for introduction under either Rule 803(24) or Rule 804(b)(6),[5] with proper findings to be provided to establish that a factual basis for admission does exist. Janich Bros., Inc. v. American Distilling Co., supra; 4 Weinstein's Evidence ¶ 804(b) (5) [02]. See 4 Louisell and Mueller, supra, discussion of Rule of Reasonableness. See also *United States v. Carlson*, 547 F.2d 1346 (8th Cir.), cert. denied 431 U.S. 914, 97 S.Ct. 2174, 53 L.Ed.2d 224 (1977); *Huff v. White Motors Corporation*, 609 F.2d 286 (7th Cir.1979); *United States v. Guevara*, 598 F.2d 1094 (7th Cir.1979); *Castilleja v. Southern Pacific Co.*, 445 F.2d 183 (5th Cir.1971); *State v. Smith*, 315 N.C. 76, 337 S.E.2d 833 (1985).

(5) Generally, the absence of the witness from the jurisdiction alone is not sufficient without further effort to obtain the evidentiary support or the direct testimony by "reasonable means."

" * * * In this case, counsel for Janich made conclusory allegations that Sherwin was outside the jurisdiction of the court. This is inadequate." *Janich Brothers v. American Distilling Co.*, supra, 570 F.2d at 859.

Wyoming does not have any civil cases directly considering the catch-all hearsay exception involved in this decision. See general discussions, *United States v. Thomas*, supra; *United States v. Carlson*,

supra. In *Caterpillar Tractor Co. v. Donahue*, Wyo., 674 P.2d 1276 (1983), a civil case, as well as *Hopkinson v. State*, Wyo., 632 P.2d 79 (1981), cert. denied 455 U.S. 922, 102 S.Ct. 1280, 71 L.Ed.2d 463 (1982), and *Schmunk v. State*, supra, the witnesses were dead, so that the unavailability question was not invoked.

In *Grable v. State, supra,* a criminal case, the availability question was considered in regard to a transcript of testimony from a prior trial. Adequate notice was given, with the witness claiming unavailability for medical reasons for travel from Texas to the Wyoming trial. Extended efforts to secure attendance were made, the absence having been occasioned by an earlier trial continuance. The court then said:

"The prosecution has the burden of establishing the unavailability of a witness to testify at trial despite good faith efforts to obtain his presence. *Ohio v. Roberts,* 448 U.S. 56, 100 S.Ct. 2531, 65 L.Ed.2d 597 (1980). Futile acts are not required, and the lengths to which the prosecution is required to proceed in order to produce a witness is a question of reasonableness. *California v. Green,* 399 U.S. 149, 90 S.Ct. 1930, 26 L.Ed.2d 489 (1970). The determination of the unavailability of a witness is a matter which rests in the discretion of the trial court, and that determination will not be overturned absent a showing of abuse of the court's discretion. *Martinez v. State, Wyo.,* 611 P.2d 831 (1980) * * *." 649 P.2d at 672.

Determinative under the confrontation question not existent in the civil case was the adequacy of cross-examination in the previous trial.

The good-faith rule has comprehensive authority, especially where a criminal trial is involved. *Barber v. Page*, 390 U.S. 719, 88 S.Ct. 1318, 20 L.Ed.2d 255 (1968); *Ohio v. Roberts*, 448 U.S. 56, 100 S.Ct. 2531, 65 L.Ed.2d 597 (1980). Due diligence is used interchangeably by some

---

**5.** Rules 803(24) and 804(b)(6), W.R.E., are identical in phrase and function except that

804(b)(6) implies the witness unavailability requirements of 804(a).

courts. *People v. Masters*, supra. It is apparent that the standard of reasonableness is to be broadly applied, including all the circumstances, the types of evidence, and the factors of fairness and justice. However, something more than simple absence from the state will inevitably be required, except in the most unusual circumstances, not demonstrated here under proponent's burden of proof of unavailability, where the only fact was the out-of-state transfer.

This court determines that introduction of Exhibit G in this case was in error.

■ Determining as we do that the introduction of the exhibit was in error, was the introduction of Exhibit G sufficiently prejudicial so that reversal is required? We answer this question in the negative. *Furtado v. Bishop*, 604 F.2d 80 (1st Cir.), cert. denied 444 U.S. 1035, 100 S.Ct. 710, 62 L.Ed.2d 672 (1979); *Janich Bros. v. American Distilling Co.*, supra; *Demars v. Equitable Life Assurance Society of United States*, supra; *United States v. Guevara*, supra.

Williams contended that the opening Motorola offer was so excessive as to demonstrate bad faith. Motorola, as a prospective customer, was not called to testify to prove the Collins breach of contract.

Collins contended that it started high but was willing to negotiate. May it suffice to observe that if Williams gave particular priority to the Collins-Motorola negotiation, written demand and notice could have been furnished rather than relying on the assumption of a possible breach to be followed with the tower construction for competitive application to the Motorola business.

Considering all of the evidence available to the court when ruling on the motion for directed verdict, we conclude that if the introduction of Exhibit G had been rejected the trial court would properly have ruled the same, and consequently introduction was not prejudicial. This determination devolves from the peculiar nature of the facts involved in this case, and could have been

different if the document had been involved in a jury decision. The jury might have been more likely to believe that Lind did know what he was writing about than is likely to be implied from judicial sophistication as a professional ability to comprehend and evaluate the reliability of evidence. *Colorado Serum Company v. Arp*, Wyo., 504 P.2d 801 (1972). See dissenting comments in *DeJulio v. Foster*, Wyo. 715 P.2d 182 (1986).

D

*Directed Verdict Against Williams*

■ The parties agree that the premise for recovery by either is whether the other party committed a material breach of the agreement.

Williams contended as justification for his tower construction that Collins was earlier in performance default. Raised as default issues were contentions of late payments, failure to maintain the tower, failure to cooperate, and a breach of duty to develop. A fifth issue devolves from the cessation of payment by Collins in 1983 as justified by the tower construction by Williams.

We find that the trial court clearly and with specificity related a justified basis for entry of the directed verdict:

"Rule 50(a) of the Wyoming Rules of Civil Procedure provides that a directed verdict may be granted only when the evidence is such that after viewing it in the light most favorable to the plaintiff and giving to him all reasonable inferences reasonable minds could not disagree as to the verdict.

"Stated another way, if after giving the plaintiff all reasonable inferences the evidence leads to only one conclusion, a directed verdict should be granted.

\* \* \* \* \* \*

"First of all, a breach of contract is a failure, without legal excuse, to perform any promise which forms a whole or a part of the contract.

"A material breach is a breach that goes to the whole consideration of the contract.

"And, as the plaintiff pointed out in its submitted jury instructions, in determining whether a breach is a material or substantial breach you may consider these factors: First, the extent to which the injured party will be deprived of the benefit which he reasonably expected; secondly, the likelihood that the breaching party will cure its breach taking account of all the circumstances including any reasonable assurances made; and, thirdly, the extent to which the behavior of the breaching party comports with standards of good faith and fair dealing. "First, I think it's important to state that the law is, as I understand, at least, that the party first committing a substantial breach of contract cannot complain that the other party thereafter fails to perform, and where one party to a contract repudiates it or refuses to perform, the injured party is not obligated to perform its promises.

"With that in mind, and reiterating the court's earlier findings in this case, that the contract is clear and unambiguous, and that the terms of the contract are not in conflict, and the parties' intentions are clearly expressed in that contract, after giving the plaintiff the benefit of every reasonable inference, the court finds the evidence has established the following:

"First, the plaintiff was not deprived of his monthly payments until January of 1983, and he neither complained nor notified the defendants that he considered any late payments a breach [at an earlier date].

"Further, even if the payment up until that time—payments, rather, were late by definition, that does not constitute a material breach of the agreement.

"The court finds, secondly, if there was a failure to maintain, and the evidence is contradictory on that point, the plaintiff was not deprived of any benefit which he reasonably expected.

"The plaintiff's own expert testified there was no damage to the plaintiff because of any maintenance problems.

"Thirdly, the court finds that no testimony regarding failure to cooperate was adduced at the trial.

" * * * [U]ntil the problem with the new tower which was constructed, the plaintiff testified that he believed there was a good relationship between the parties. "With regard to the duty to develop, the evidence adduced was that there was space available on one of the 2 existing towers for further development, and the only evidence of dealing with Motorola came from either Mr. Klinker, who said that the defendant's dealings were reasonable, and the letter from the Forest Service, which also indicated they were reasonable.

"The only reasonable conclusion that can be drawn is that Motorola, or Crescent, or whomever, took advantage of the plaintiff's unfounded belief that the defendants were not properly developing the site.

"However, there was no evidence adduced that they were not properly developing the site."

The evidence supports the decision, and the legal rules involved justify the directed verdict entry by analysis and application of the trial court. *Boswell v. First National Bank of Laramie*, 16 Wyo. 161, 92 P. 624, reh. denied 93 P. 661 (1907).

"In reviewing the grant of a directed verdict by a trial court, consideration must be given to all evidence favorable to party against whom the motion is directed, as well as to all reasonable and legitimate inferences which might be drawn therefrom. *McCarthy v. Croker*, Wyo. 1976, 549 P.2d 323; *Barnes v. Fernandez*, Wyo. 1974, 526 P.2d 983; *Brennan v. Laramie Newspapers, Inc.*, Wyo. 1972, 493 P.2d 1044. Whether or not the evidence so viewed is sufficient to create an issue for the jury is solely a question of law to be answered by the trial court. That court must determine whether or not the evidence is such that, without

weighing the credibility of the witnesses, or otherwise, considering the weight of the evidence, there is but one conclusion as to verdict which men of reason could reach." *Town of Jackson v. Shaw,* Wyo., 569 P.2d 1246, 1250 (1977).

See also Note, *Evidence Court Considers on Motion to Direct Verdict,* 10 Wyo.L.J. 164 (1956).

### E

### *Scope of the Summary Judgment Order*

 By judgment, the trial court determined and ordered in regard to summary judgment:

"(6) That because of the material breach of the Agreement between the parties by Plaintiff as set forth in paragraph II.D. (4), and because of the refusal by the Plaintiff to perform the Agreement between the parties, or Plaintiff's repudiation of the contract, thereafter the Defendant was excused from performance of the terms of the Agreement between the parties.

\* \* \* \* \* \*

"(7) That the Defendant should be awarded the equitable remedy of specific performance of the Agreement between the parties, and that from this date forward the Agreement between the parties should be performed in accordance with the ruling of the Court.

"(8) That prior to the 8th day of October, 1985, the parties shall be left as they are with each retaining the monies from tower rental which they presently have in their possession or which have accrued prior to this date."

The issue raised by the decision is whether in granting a decree of specific performance prospectively the court could disregard payment rights devolving from the contract for the earlier period after controversy between the parties had developed.

Otherwise stated, could Collins retain monies clearly due to Williams from the time when Williams commenced construction of the fourth tower, particularly since it was more than six months before any completion for service occurred? Since the performance of plaintiff in no way affected the contributory obligation of Collins, we answer this question in the negative, and consequently reverse for determination of the amounts properly due. To do otherwise would unjustly enrich Collins for his failure to comply with his own contract obligations and excuse rental and joint use nonpayment. See *Schultz v. Campbell,* 147 Mont. 439, 413 P.2d 879 (1966); *Nugent v. Beckham,* 37 N.C.App. 557, 246 S.E.2d 541 (1978).

The rules on specific performance explained in *McCoy Farms, Inc. v. J & M McKee,* 263 Ark. 20, 563 S.W.2d 409, cert. denied 439 U.S. 862, 99 S.Ct. 184, 58 L.Ed.2d 171 (1978), lend support to our conclusion:

" \* \* \* Specific performance is an equitable remedy which compels the performance of a contract on the precise terms agreed upon or such a substantial performance as will do justice between the parties under the circumstances. It is a means of compelling a contracting party to do precisely what he should have done without being coerced by a court. 81 C.J.S. Specific Performance § 2, 701; 71 Am.Jur.2d 10, Specific Performance, § 1; Restatement of the Law, Contracts § 358, Comment a, § 359(2), § 360(b), § 326(c). The object in such cases is to place the party without fault in as nearly the same position as he would have been had there been no default by the other party. *Pillsbury v. J.B. Streeter, Jr. Co.,* 15 N.D. 174, 107 N.W. 40 (1906). The guiding principle in such cases is to *relate the contract back* to the date set therein. *Ellis v. Mihelis,* 60 Cal.2d 206, 32 Cal.Rptr. 415, 384 P.2d 7 (1963); *Meyer v. Benko,* 55 Cal.App.3d 937, 127 Cal.Rptr. 846 (1976)." (Emphasis added.) 563 S.W.2d at 415.

 As indicated in the above quotation, the object of specific performance is to place the party *without fault* in the position he would have been in had there

been no default. Neither party is totally without fault in this case. Collins withheld rental income from Williams after Williams partially breached the contract by building a new tower.

Regarding recovery by a party who has breached his contract, Williston on Contracts points out that:

"A satisfactory solution is not easy, for two fundamental legal policies seem here to come in conflict. On the one hand, it seems a violation of the terms of a contract to allow a plaintiff in default to recover—to allow a party to stop [performance] when he pleases * * *.

"On the other hand, to deny recovery often gives the defendant more than fair compensation for the injury he has sustained and imposes a forfeiture (which the law generally abhors) on the plaintiff. The mores of time and place will often determine which policy will be followed.

"But the second of these opposing policies has steadily increased in favor and probably represents the weight of authority. Except where the obliquity of the defective performance is of a sort that indicates moral obliquity, and where, therefore, the court feels that the one who is in default may properly be penalized, the tendency is to grant him restitution if a substantial net benefit has accrued to the defendant by partial performance." 12 Williston on Contracts, third edition § 1473, pp. 221–224.

The essence of specific performance is that the contract will be enforced, *Otis Oil & Gas Corporation v. Maier*, 74 Wyo. 137, 284 P.2d 653 (1955), and the decision of this case is that the contractual relationship will continue as if no breach had occurred, *McCoy Farms, Inc. v. J & M McKee, supra*, and the accounting requirement to effectuate the contractual result is now properly before the trial court.

An accounting was required in *Duane Sales, Inc. v. Carmel*, 57 A.D.2d 1003, 394 N.Y.S.2d 307 (1977), reversed on other grounds, 49 N.Y.2d 862, 427 N.Y.S.2d 930, 405 N.E.2d 175 (1980), after specific performance of a real property purchase option agreement had been granted. The New York Supreme Court modified the judgment, concluding that:

"* * * an accounting should be had which should take into consideration, among other things, the following: the *rents received by defendants during the period from the date of the conveyance of the title to the premises;* any profits resulting to the defendants in their operation of the property; any losses sustained by the plaintiff because of the delay in conveyance of title; necessary expenses incurred by the defendants in the operation of the property, such as payments of principal and interest on the mortgage, property taxes, insurance, and minor repairs; the benefits to the plaintiff in retaining the use of the purchase money during the pendency of the litigation." (Emphasis added.) 394 N.Y.S.2d at 308, 405 N.E.2d at 175.

Although Duane Sales was reversed on other grounds by the Court of Appeals of New York, the quoted language regarding the accounting was cited with approval in *Bravo v. Buelow*, 214 Cal.Rptr. 65, 168 Cal.App.3d 208 (1985), an action for specific performance of a real estate sales contract. The California Court of Appeal further said:

" 'In California the compensation which may be awarded incident to a decree of specific performance is not for breach of contract and is not legal damages. The complainant affirms the contract and asks that it be performed. Since the time for performance has passed, the court relates that performance back to that date, by treating the parties as if [performance] * * * had taken place at that time. Thus the [real estate] buyer is entitled to the rents and profits from the time the contract should have been performed, and the [real estate] seller is entitled to an offset for the interest on the purchase money which he would have received had the contract been performed. The process is more like an accounting between the parties than an

assessment of damages. [Citations].' " 214 Cal.Rptr. at 69, quoting from *Hutton v. Gliksberg*, 128 Cal.App.3d 240, 248, 180 Cal.Rptr. 141 (1982).

We equate the remedy provided to the buyer and seller of real estate in *Bravo v. Buelow*, supra, to our conclusion that each party should receive a pro-rata share of the revenue due under the contract. See also *Masholie v. River Edge Estates*, 129 N.J.E. 228, 19 A.2d 27 (1941), reh. denied 135 N.J.E. 193, 37 A.2d 861 (1944).[6]

 In regard to the funds due from Collins to Williams, the amount is in the undisputed total of $29,491. The remaining issue is, what should occur with regard to the Williams tower and the cost incurred in its construction? It is our conclusion that by enforcing the contract the option is vested in Collins to either accept the tower and its cost or accept the funds earned by Williams for credit on the balances remaining due on the agreement for division of profits. Reasonable time should be afforded by the trial court upon remand for Collins to make the election.[7]

With a contract life remaining of six years, it surely would benefit both parties for the tower to be used if that use can accommodate an increased revenue to the venture. Likewise, then, at the termination of the period, the tower, as well as the other two towers (the Forest Service and the middle tower), will be joint-venture

property in an undivided 50 percent interest rather than Williams owning one tower and a 50 percent interest in two other towers.

The decision of the trial court is affirmed except as remanded for entry of an order affording an accounting and option to Collins to acquire the newly constructed tower for the venture, as is herein provided.

---

6. In Masholie, a corporate director self-dealing case in which specific performance was granted, equitable title to certain shares of stock was placed in the complainant from the date the contract was made,

"* * * notwithstanding the fact that the judgment, or decree, awarding title to the stock to this complainant was entered approximately five years later." 19 A.2d at 29.

7. The financial facts are clearly established in the record. The revenue accrued but not paid to Williams totals $29,491, the tower costs and expenses of operation total $12,320, with income of $18,200, or a net revenue of $5,280. Collins is obligated to pay the sum of $29,491, the amount accrued and due to Williams. It is entitled to a credit in this computation of one-half the total revenues received by Williams of $9,100, with a net amount to be paid of $20,391.

Alternatively, should Collins elect to accept the Williams tower as an asset of the venture, in accord with the agreement for joint operation and control, then payment is due of one-half the costs of the tower of $12,320, or a total additional of $6,160. Consequently, upon the exercise of this election, the amount to be paid would be $26,551, with the Williams tower then constituting a venture asset within the control of Collins pursuant to the terms of the original agreement. By this computation, Williams is chargeable with all income and Collins has the right to elect whether the tower will constitute a venture asset by a payment of 50 percent of the cost incurred. The record before us does not demonstrate any appeal supersedeas bond. If delay by order or non-court arrangement occurred past the decree date in the enforcement of the decree, any accounting should accommodate the additional period involved.